**\*NOT FOR PUBLICATION\***

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | : : : | |
| v. | : : | Crim. Action No.: 14-287-1 (FLW) |
| MENDEL EPSTEIN, | : : | **OPINION** |
| Defendant. | : : | |

**WOLFSON, Chief Judge:**

Defendant Mendel Epstein ("Defendant"), a prisoner currently serving a 120-month sentence at FCI Otisville ("Otisville"), has renewed his prior motion for compassionate release pursuant to the First Step Act, 18 U.S.C. § 3582(c)(1)(A). The Court previously denied Defendant's motion because he failed to exhaust his administrative remedies.[1] In the instant motion, Defendant again seeks release from Otisville to home confinement based on his poor health and recent contraction of COVID-19. The Government opposes Defendant's motion, maintaining that his condition is stable and

---

[1] Under the First Step Act, a court may only consider a motion for compassionate release "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A); *see also United States v. Raia*, 954 F.3d 594, 596–97 (3d Cir. 2020). Defendant filed a request for compassionate release with the Otisville warden on March 27, 2020. The thirty-day period has now lapsed, satisfying the exhaustion requirement.

1

that the Bureau of Prisons ("BOP") not only has taken significant steps to limit the spread of COVID-19 in Otisville, but also taken the appropriate measures to treat Defendant's health conditions. For the reasons explained below, Defendant's motion is **DENIED.**

I.  BACKGROUND

On April 21, 2015, Defendant was convicted of conspiracy to commit kidnapping.  (*See* Jury Verdict as to Mendel Epstein, ECF No. 352.)  Defendant's conviction followed a jury trial wherein he was charged with various kidnapping-related offenses, stemming from his involvement in a scheme through which he, along with others, sought to assist Jewish women in obtaining religious divorces from their recalcitrant husbands.  (*See* Amended Redacted Indictment, ECF No. 344.)  On December 15, 2015, this Court sentenced Defendant to a term of imprisonment of 120 months.  (*See* Judgment as to Mendel Epstein, ECF No. 394.)  Defendant was also sentenced to 5 years of supervised release following his imprisonment, and he was ordered to pay a special assessment of $100.  (*Id.*)  Thus far, Defendant has served approximately 4 years of his 10-year sentence.

On March 27, 2020, Defendant submitted a request to the Warden at Otisville to file a F-8 form and petition for compassionate release.  On April 3, 2020, counsel followed up with a letter to the Warden, submitting supporting exhibits, including certifications from two physicians who have reviewed Defendant's

2

medical records.  On April 7, 2020, Defendant filed a Motion for Compassionate Release, which was opposed by the Government based upon Defendant's failure to exhaust his administrative remedies. On April 9, 2020, this Court denied Defendant's Motion without prejudice, finding that the exhaustion requirements are mandatory and "not susceptible to any judicially created exceptions." (Op., ECF No. 474.)  I, then, directed that Defendant that he could renew his motion after exhausting his administrative remedies, or, if he received no response within 30 days of his request to the Bureau of Prisons.  (*Id.* at 10.)

In the interim, Defendant contracted COVID-19.  Defendant is 74 years old and suffers from numerous underlying conditions, including heart disease, hypertension, diabetes, renal impairment, and obesity, that are known comorbidities for COVID-19.  *See Coronavirus Disease 2019 (COVID-19): People Who Are at Higher Risk for Severe Illness*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html.  On April 14, 2020, Defendant complained of a cough and shortness of breath.  (Lindley Aff. ¶ 2, ECF No. 480-2.)  At that time, Defendant was transferred to the Isolation Unit, where he was given individualized medical treatment and tested for COVID-19.  (*Id.* ¶¶ 2-3.)  On April 16, 2020, Defendant was taken to the hospital.  (*Id.*)  While in the hospital, Defendant was treated with supplemental oxygen and was never placed on a ventilator.

(*Id.*)  Test results later confirmed that Defendant was positive for COVID-19.  (*Id.*)  On April 22, 2020, Defendant was discharged from the hospital and again placed in the Isolation Unit.  (*Id.* ¶ 5.)  Since his discharge, Defendant's condition has improved and he has not exhibited any signs of fever or other symptoms.  (*Id.*)  Both his oxygen saturation levels and other vital signs have been within normal parameters.  (*Id.*)  On May 5, 2020, Defendant was released back to the Otisville Camp.  (*Id.* ¶ 6.)  According to the Government, the BOP has taken additional measures to monitor and treat Defendant at Otisville since his return from the hospital.

On May 4, 2020, Defendant filed the instant motion seeking compassionate release under the First Step Act. Defendant argues that his age and medical conditions, including his recent contraction of COVID-19, put him at particularly high risk of further infection and complications. Moreover, Defendant contends that he is not a danger to the community and will not reoffend if released from prison.  As to his release, Defendant requests that this Court permit him to serve the remainder of his sentence on home confinement.  He claims that he will quarantine in his home, which is in a gated, adult community.  Defendant's family will provide him with financial assistance and can pay for any medical needs that may arise.  The Government opposes Defendant's motion and argues that there are no extraordinary or compelling reasons to release Defendant on home confinement at this time.

4

**II.  DISCUSSION**

Once a federally imposed sentence commences, a district court has limited authority to modify that sentence. *Dillon v. United States*, 560 U.S. 817, 825 (2010) ("'[A] judgment of conviction that includes [a sentence of imprisonment] constitutes a final judgment' and may not be modified by a district court except in limited circumstances." (alterations in original) (quoting 18 U.S.C. § 3582(b)).  One such authority for modifying a sentence is found in the recently-enacted First Step Act, which allows a defendant to be afforded compassionate release for "extraordinary and compelling reasons."  18 U.S.C. § 3582(c)(1)(A)(i).  The statute provides, in relevant part:

> (c) Modification of an imposed term of imprisonment.
> The court may not modify a term of imprisonment once it has been imposed except that—
> 
>> (1)  in any case—
>> 
>>> (A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the

>> facts set forth in section 3553(a) to the extent that they are applicable, if it finds that –
>>
>> > (i) extraordinary and compelling reasons warrant such a reduction.

18 U.S.C. § 3582(c)(1)(A)(i).  In other words, a defendant seeking a reduction in his sentence under the First Step Act "bears the burden of satisfying both that he has (1) exhausted remedies before seeking judicial review, and (2) that compelling and extraordinary reasons exist to justify compassionate release."  *United States v. Sellers*, Crim. No. 10-434, 2020 WL 1972862, at *1 (D.N.J. Apr. 24, 2020) (citing 18 U.S.C. § 3582(c)(1)(A)).

Congress did not define the term "compelling and extraordinary reasons," but instead directed the Sentencing Commission to define the term.  *See* 28 U.S.C. § 994(t) (providing that the Sentencing Commission "shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples").  While the Sentencing Commission had defined that term as it relates to the BOP's discretion under the previous version of section 3582(c)(1)(A), it has not, however, updated its Policy Statement since the passage of the First Step Act.  *See United States v. Rodriquez*, ___ F. Supp. 3d ___, 2020 WL 1627331, at *3 (E.D. Pa. Apr. 1, 2020); *see also* U.S. Sentencing Guidelines Manual ("U.S.S.G."), § 1B1.3, Application Note 1 (U.S. Sentencing

6

Comm'n 2018).  Nevertheless, the Policy Statement provides useful guidance for district courts in assessing a defendant's eligibility for compassionate release, but it "does not constrain [a court's] independent assessment of whether 'extraordinary and compelling reasons' warrant a sentence reduction under § 3852(c)(1)(A)."  *Rodriquez*, 2020 WL 1627331, at *4 (alteration in original) (quoting *United States v. Beck*, 425 F. Supp. 3d 573, 581–82 (M.D.N.C. 2019)).  The Policy Statement provides that a defendant may show extraordinary and compelling reasons for compassionate release based on the medical condition of the defendant, the age of the defendant, the defendant's family circumstances, or for "other reasons."   U.S.S.G. § 1B1.13, Application Note 1.[2]  Relevant to Defendant's motion, a defendant may show extraordinary and compelling reasons for release based on a medical condition where (1) "[t]he defendant is suffering from a terminal illness (*i.e.*, a serious and advanced illness with an end of life trajectory)," or (2) he or she is

> (I)     suffering from a serious physical or medical condition,
>
> (II)    suffering from a serious functional or cognitive impairment, or

---

[2]    It is unresolved whether a Court, can, in its discretion, determine whether a defendant has shown extraordinary and compelling reasons for release under the catchall provision of the Policy Statement.  *See Rodriquez*, 2020 WL 1627331, at *3–4.  Because Defendant seeks compassionate release based on a medical condition, this Court need not determine whether it has discretion to find that other reasons exist to permit compassionate release.

7

>    (III) experiencing deteriorating physical or mental health because that of the aging process,
>
> that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

*Id.*

Moreover, as the First Step Act instructs, the Court must consider "the factors set forth in section 3553(s) to the extent that they are applicable." § 3582(c)(1)(A). Here, I find that the following section 3553(a) factors are applicable to my decision:

>    (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
>    (2) the need for the sentence imposed—
>
>        (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
>        (B) to afford adequate deterrence to criminal conduct.

18 U.S.C. § 3553(a)(1), (a)(2).

Considering these factors first, I cannot overstate the serious nature of Defendant's crime. Defendant's underlying criminal conduct was severe and violent. He not only relied upon his status in his religious community to recruit young and impressionable men to commit kidnapping-related crimes, he

8

convinced them that their conduct was sanctioned by their religion. While Defendant was only convicted on one count of conspiracy to commit kidnapping, the criminal conspiracy lasted for years, and he was involved in multiple kidnappings where violence occurred. As I stated on the record during Defendant's sentencing, there is no doubt that he committed a crime that was deserving of a 10-year term of imprisonment.  While there is no question that Defendant poses a low risk of recidivism, *see* U.S. Sentencing Comm'n, *The Effects of Aging on Recidivism Among Federal Offenders* 30 (2017), available at https://www.ussc.gov/sites/[s]default/files/pdf/research-and-publications/research-publications/2017.20171207_Recidivism-Age.pdf, the serious nature of Defendant's crime and the violence involved in those crimes weigh against his release.  Moreover, I find that the need for Defendant to serve the remainder of his sentence still exists to "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense."  § 3553(a).  Accordingly, I hold that the section 3553(a) factors weigh against Defendant's release to home confinement.

Next, under the First Step Act, I consider whether extraordinary and compelling reasons exist for compassionate release.  Having reviewed the pertinent certifications from medical professionals submitted by both parties and Defendant's medical records, I find that Defendant's conditions are being

9

properly managed by the BOP at Otisville and that Defendant has not demonstrated extraordinary and compelling reasons for his release to home confinement. To begin, I acknowledge that Defendant suffers from underlying conditions that would make him more susceptible to contracting COVID-19, and that the virus would further complicate those conditions. In addition to his age, those are valid concerns, but Defendant has already contracted COVID-19 and, crucially, the BOP has properly managed the disease by, first, transporting him to the hospital for treatment when his condition became critical, and the medical records reveal that the BOP continues to monitor or treat Defendant's aliments to this day.

Nevertheless, Defendant submits a declaration from Dr. Robert Goldstein, who opines that Defendant is not being properly cared for at Otisville.[3] Dr. Goldstein specifically expresses concern over Defendant's renal failure and blood pressure.[4] (Goldstein

---

[3] Dr. Goldstein has not personally treated or examined Defendant; rather, his opinions are based upon a review of Defendant's medical records and statements from Defendant, his attorney, and his family members regarding Defendant's health condition.

[4] Dr. Goldstein additionally references that, on May 7, 2020, Defendant presented with "severe gait disturbance, which has required a walking cane," as well as "extreme dizziness and light-headedness." (Goldstein Decl., ¶ 16.) A review of Defendant's medical records, however, indicates that Defendant has not reported these symptoms to the medical facility at Otisville since being treated for COVID-19. And, more importantly, it appears from the records that Defendant was provided with a cane to assist with his mobility in May 2016—long before he contracted COVID-19.

10

Decl., ¶¶ 11-16, ECF No. 481-1.) On the other hand, Dr. Alphonso Linley, the Acting Clinical Director at Otisville, recognizes that Defendant requires careful monitoring, and maintains that Defendant has been continuously monitored as needed. (*See* Suppl. Linley Aff., ¶ 3, ECF No. 482-1.) Indeed, Dr. Linley states that, with respect to Defendant's renal health, his "kidney function is being carefully monitored by the medical staff at FCI Otisville. His renal functioning has improved considerably and continues to improve." (*Id.*, ¶ 5.) Moreover, Dr. Linley confirms that Defendant's blood pressure, although it fluctuates from day to day, is being adequately managed. (*Id.* ¶ 4.) Dr. Linley further states that Defendant has not made a Sick Call request since April 14, 2020, when he first complained of symptoms of COVID-19. (*Id.* ¶ 7.)

Considering these conflicting medical opinions, the Court finds that while Defendant's condition is serious, it does not "substantially diminish[ his] ability to provide self-care within the environment of a correctional facility and from which he . . . is not expected to recover." U.S.S.G. § 1B1.13, Application Note 1(A)(ii). Since returning to Otisville from the hospital, Defendant's condition has greatly improved and it does not appear that Defendant has exhibited further symptoms of COVID-19. However, Defendant takes issue with the type of medical treatment

11

that he has been given since his return from hospitalization.[5] For example, Defendant insists that the BOP has woefully failed to manage his blood pressure, which issue Dr. Goldstein highlights. But, the medical records tell a different story. Prior to contracting COVID-19, Defendant's blood pressure fluctuated, and at times, he presented with high blood pressure. After his COVID-19 infection, Defendant's blood pressure continues to fluctuate with some days registering a normal blood pressure level and others registering a higher level. Defendant claims that his most recent vitals show that his blood pressure was very high on May 13, 2020, yet, Defendant's blood pressure was likewise high at times prior to contracting COVID-19. While certain days seem to be higher than others, what is clear to the Court, particularly from the list of medications provided in the records, is that the BOP has given adequate care to control and manage Defendant's hypertension, which includes providing the necessary drugs and monitoring. These measures have apparently stabilized Defendant's condition in this respect.

---

[5] Defendant also highlights that during his hospitalization he suffered atrial fibrillation, a rapid irregular heartbeat, that Dr. Goldstein opines could indicate Defendant suffered a heart attack. (See ECF No. 479-1, at 12.) However, the medical records from both the hospital and Otisville do not suggest, let alone a diagnosis, that Defendant suffered a heart attack; rather, the medical notes describe that the atrial fibrillation is being treated with medication. Without further medical evidence, the Court is satisfied that Defendant's heart condition is being treated and monitored.

Additionally, while Dr. Goldstein expressed his concerns regarding the exacerbation of Defendant's renal and heart conditions, Defendant's medical records further reveal that those conditions are similarly under control. Indeed, there is no evidence, besides Defendant's own statements and Dr. Goldstein's opinion of risks, that tends to show that any of the underlying conditions suffered by Defendant are so severe that would be extraordinary or compelling.[6]

In fact, one of the primary reasons why Defendant is recovering well from COVID-19 is the medical treatment that the BOP has been providing. Gleaning from the medical records, periodic monitoring and daily medications, or the appropriate treatment when necessary, continue to be provided to Defendant. However, Defendant argues that those treatments are not sufficient, and that in his doctor's view, medical care that he would receive during home confinement would be better suited for his conditions. I disagree. What Defendant essentially advocates for is the kind of optimal health care that courts have routinely

---

[6]   Prior to contracting COVID-19, Defendant was provided with a CPAP machine to treat his sleep apnea issues. Right before Defendant was hospitalized for COVID-19 related complications, he used the machine to assist him with breathing, as he complained of shortness of breath. However, since returning to the Otisville Camp, the record does not indicate that Defendant has been using his CPAP machine for breathing issues related to COVID-19; instead, according to the records, Defendant's oxygen levels have stabilized.

13

rejected. *See Rhinehart v. Scutt*, 894 F.3d 721, 750 (6th Cir. 2018) ("An inmate is entitled to adequate medical care, not the best care possible."); *Gandy v. Corr. Med. Servs., Inc.*, No. 06-21, 2007 WL 1038580, at *5 (D.N.J. Mar. 29, 2007) ("Prisoners are entitled to adequate care, not the best and most timely care possible . . . ."); *see also Gibbons v. Montgomery Cty.*, No. 16-1233, 2016 WL 3878182, at *3 (E.D. Pa. July 18, 2016); *Skladany v. Provanzano*, No. 12-2497, 2012 WL 1981824, at *4 (D.N.J. June 1, 2012); *Turner v. Kirsch*, No. 08-2005, 2011 WL 1430300, at *4 (E.D. Pa. Apr. 13, 2011). Instead, my inquiry here is whether the BOP has provided adequate treatment such that Defendant's conditions are properly managed. From the time Defendant contracted COVID-19 to present time, I find that the BOP has given Defendant just that—adequate care. *See United States v. Davis*, No. 06-20020, 2020 WL 2395977, at *2 (C.D. Ill. May 12, 2020) (finding defendant's arguments regarding risk of contracting COVID-19 moot where he had already contracted the virus and "is receiving healthcare in the facility"); *United States v. Bogdanoff*, Crim. No. 12-0190-1, 2020 WL 2307315, at *5 (E.D. Pa. May 8, 2020) (observing that 73-year-old defendant may not be eligible for compassionate release where he already contracted COVID-19 and was being adequately cared for); *United States v. Russo*, Crim. No. 16-441, 2020 WL 1862294, at *8 (S.D.N.Y. Apr. 14, 2020) (denying motion for compassionate release where at-risk defendant had

14

already contracted COVID-19 and was being well-monitored and adequately cared for).[7]

Relatedly, and significantly, since the inception of the COVID-19 pandemic, the Otisville Camp is currently limited to half its average population. In that regard, the BOP has more resources to devote to taking care of those who remain in the facility, such as Defendant.[8] In sum, while there is still a risk that Defendant may suffer additional complications because of his underlying conditions, his health is being adequately monitored by prison medical personnel and they continue to care for him. Indeed, Dr.

---

[7]   In support of his motion, Defendant relies on several cases in which courts have granted motions for compassionate release based on the defendant's age and risk factors for COVID-19. *See, e.g.*, *United States v. Saad*, No. 16-20197, 2020 WL 2065476, at *6 (D. Mich. Apr. 29, 2020) (granting motion for compassionate release in light of COVID-19 based on defendant's age (71) and serious underlying medical conditions); *United States v. Ben-Yhwh*, Crim. No. 15-830, 2020 WL 1874125, at *4 (D. Haw. Apr. 13, 2020) (granting motion for compassionate release based on risk of COVID-19 infection to 73-year-old defendant with serious underlying medical conditions). The Court, however, finds these cases inapposite to this matter because they do not address the situation, here, where the defendant has already contracted and been treated for symptoms caused by COVID-19.

[8]   Although Defendant argues that it is still difficult to social distance despite the reduction in inmate population, and there are inadequate precautions in the facility, the BOP is taking additional measures to address this issue, including providing face masks to inmates and staff, limiting visitor access, and screening any employee, contractor, or new inmate that enters Otisville. (See Schreffler Aff., ¶¶ 7-11, ECF No. 480-1.) And, if Defendant were released to his home in Lakewood, New Jersey, which he claims is a gated, adult community, that does not insure who might frequent his home, be it family or community members.

Linley explains that if Defendant requires more specialized care that cannot be provided by the prison facility, he would be transferred to a regional hospital.

Moreover, while the parties dispute whether Defendant is at risk of re-infection with the virus if he remains at Otisville, that issue is not dispositive of my decision. There is currently no medical consensus as to whether someone who has tested positive for COVID-19 will be protected from another infection. To the extent Defendant bases his motion on his apprehension of being infected with COVID-19 for a second time, the risk is purely speculative. Mere "speculation concerning possible future conditions does not constitute a 'compelling reason'" for release. *See United States v. Veras*, Crim. No. 19-010 2020 WL 1675975, at *4 (M.D. Pa. Apr. 6, 2020); *see also Raia*, 954 F.3d at 597 ("[T]he mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread.").

Taken in the aggregate, I find that Defendant has not shown extraordinary and compelling reasons to justify his release. While the Court is sympathetic to Defendant's concerns, it is evident he is receiving adequate care at Otisville and that his condition is appropriately managed.

16

**III. CONCLUSION**

For the foregoing reasons, Defendant's Motion for Compassionate Release is **DENIED**. This denial is without prejudice to renewal based on, among other possibilities, a substantial deterioration of Defendant's condition or a change in the ability of the BOP to care for him.

DATED: May 18, 2020

/s/ Freda L. Wolfson
Hon. Freda L. Wolfson
U.S. Chief District Judge